**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

CORIE MILLER,                     :
                                  :      Civil Action No. 03-2651 (WJM)
        Petitioner,               :
                                  :
        v.                        :      **OPINION**
                                  :
ROY L. HENDRICKS,                 :
et al.,                           :
                                  :
        Respondents.              :


**APPEARANCES:**

Petitioner pro se                 Counsel for Respondents
Corie Miller                      Linda K. Danielson
New Jersey State Prison           Deputy Attorney General
SBI # 190197C/ID#285961           Office of NJ Attorney General
P.O. Box 861                      Division of Criminal Justice
Trenton, NJ 08625                 Appellate Bureau
                                  P.O. Box 086
                                  Trenton, NJ 08625


**MARTINI**, District Judge

        Petitioner Corie Miller, a prisoner currently confined at

New Jersey State Prison, has submitted a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are

Warden Roy L. Hendricks and the Attorney General of the State of

New Jersey.

        For the reasons stated herein, the Petition must be denied.

I.   <u>BACKGROUND</u>

A.   <u>Factual Background</u>

The relevant facts are set forth in the opinion of the
Superior Court of New Jersey, Appellate Division.[1]

> Shortly after 10 p.m. on July 13, 1995 Julissa
> Vargas, age 21, returned to her home in Paterson from
> one of her two jobs and received a message that her
> long-time friend, Cindy Villalba, age 20, had called.
> Vargas immediately phoned Villalba, a student at
> Rutgers University who had been away since May on a
> study trip to Costa Rica.  After Villalba invited
> Vargas to her home, she immediately drove her 1986
> Dodge Colt to the Villalba residence, also in Paterson.
>
> Upon arrival just past 10:30 p.m., Vargas had a
> snack with the Villalba family and went upstairs with
> Villalba to her room to talk.  Just after 11 p.m., they
> decided they wanted to smoke cigarettes and, out of
> respect to Villalba's parents who did not approve of
> smoking, told Villalba's mother, Anna, that they were
> going for a short drive.  Vargas and Villalba drove to
> East 38th Street, a predominately residential road in
> Paterson near Route 20; they parked on the side of the
> road with the windows rolled down.  It was a warm
> evening and Vargas's car had no air conditioning.
>
> While the two were discussing Villalba's trip,
> Vargas heard some people approaching from behind.
> Before she could turn around to look, three men
> suddenly appeared, two on Vargas's side of the car and
> one of Villalba's side.  Vargas recalled that one of
> the men was heavy, while the other two were thinner;
> all three were "black" or African-American.  She also
> noted that all three men seemed in their early twenties

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding
instituted by an application for a writ of habeas corpus by a
person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be
presumed to be correct.  the applicant shall have the burden of
rebutting the presumption of correctness by clear and convincing
evidence."

and of similar height.  Vargas also remembered that one
of the men had his T-shirt pulled up over his head.

According to Vargas, the heavy-set man squatted
down next to her and stated, "It's not your lucky day."
He then pulled out a small gun, which although largely
covered by his hand, seemed dark grey or silver, and
demanded money.  Vargas and Villalba had no money;
neither had brought a purse with them.

After learning that the girls had no money, the
heavy-set man struck Vargas in the back of the head
with the gun and ordered her out of the car.  Once
Vargas was outside the car, the heavy-set man ducked
his head inside, while the other man told Vargas not to
move.  According to Vargas, at some point either before
or after she got out of the car, the gun went off,
causing her ears to ring.  When the heavy-set man
pulled his head out of the car, Vargas heard him say,
"We got to get out of here," and the three men
immediately ran away.

Back in her car after the men were gone, Vargas
heard Villalba say, "Oh, my God," while gagging and
gasping for air.  Vargas turned and saw blood at
Villalba's side and called out Villalba's name but got
no response.  Vargas immediately started the car and
drove Villalba to the emergency room at Barnert
Hospital.

Dr. Anthony Catania recalled that an unconscious
Villalba was brought into the emergency room at 11:30
p.m., with a bullet wound to the left chest.  After
determining Villalba had no discernible pulse, Catania
attempted to resuscitate her.  Despite his efforts,
Catania pronounced Villalba dead at 12:15 a.m. and then
broke the news to her waiting parents.

An autopsy was performed on July 14, 1995 by Dr.
Yury Kogan of the Regional Medical Examiner's Office.
Kogan determined that, upon entry, the bullet had
traveled downwards, from left to right, passing through
Vargas's chest muscles, left lung, heart, and
diaphragm, and into her liver where it was found
embedded in a blood clot.  Kogan concluded that
Vargas's death had resulted from a penetrating gunshot
wound to the chest, which had perforated her heart,

3

lung and liver, resulting in massive internal bleeding and a consequent loss of oxygen to the brain.

...

Detective William Nativo of the Passaic County Sheriff's Department processed Vargas's car at the Paterson Police Motor Pool with the assistance of two other officers in the early morning hours of July 14, 1995.  The officers discovered seven latent fingerprints which were lifted from the driver's side back window, the passenger side door, and both the driver's and passenger sides of the roof.  They also found a .25 caliber shell casing on the floor behind the passenger seat during a subsequent examination of the interior of the car.

...

At about 5 a.m. on July 15, 1995, Finer and McNamara went to Greene's residence, knocked on the door, and were admitted by an elderly woman.  They then discovered Greene and codefendant Corie Miller sleeping on the living room floor.  McNamara immediately arrested Greene, and Detective George Jadlos of the Paterson Police Department drove both Greene and Miller back to the station.  The remaining officers then searched Greene's home but failed to locate the murder weapon or any ammunition.

At the station, Finer interviewed defendant Miller in a back room away from Greene.  He explained to defendant why Greene had been arrested and asked him to inform Greene about the fingerprint match and advise him to tell the police the truth.  Defendant complied with this request and was then released by the police.

However, only minutes later, Jadlos was ordered to locate defendant and bring him back to the station. Upon his return to the station, defendant was immediately arrested.  In response to questioning by Jadlos, defendant related that he spent the night of July 13, 1995 in Paterson at his girlfriend's house and then stayed with Greene the following night.  Although defendant initially denied any knowledge of the shooting, he broke down after Jadlos confronted him with information which had been obtained from Greene. According to both Jadlos and Finer, who was also

4

present at the time, defendant started to cry, stating "I did not mean to shoot that young girl, it was an accident." Finer also recalled that, upon his mother's arrival later that morning, defendant embraced her and stated, "Mom, I'm sorry, I didn't mean to kill that girl."

Defendant then explained that he, Greene and Tisdol spotted the car containing the two girls on East 38th Street and, at his suggestion, decided to rob them. Defendant had a small chrome .25 caliber automatic with him at the time which he claimed to have purchased in New York City for seventy-five dollars. He stated that he pulled his T-shirt up from behind and over his head in order to cover the scar on his forehead and crept up on the driver's side of the vehicle with Greene, while Tisdol went around to the passenger side.

Defendant related that he thrust the gun through the open window so that it was next to the driver's head and demanded money. He stated he became upset when the girls denied they had any money, and he pulled the "slide" back on the gun in order to make the girl nearest to him "shit in her pants." He then reached into the car and struck the driver in the back of the head. According to defendant, at that moment, the gun "busted a cap."

Defendant claimed that he next ordered the driver to take the keys out of the ignition and get out of the car. When she complied, he reached in, searched the car and then told her to get back in. Defendant stated that while his head was still in the car, he looked over at the passenger and noticed that she was breathing very hard and had a purple hole by her left breast. He asked her if she was okay or if he had shot her but she did not respond. Realizing that she had been shot, he pulled his head out of the car, stating, "Let's get the fuck out of here" and began to run in the direction of Route 20. Defendant stated that he threw the gun across the highway toward the river as he ran.

At the conclusion of defendant's statement, Jadlos asked defendant to show him where the gun was. Defendant agreed and they proceeded to the scene of the shooting. Defendant showed Jadlos where the car was

parked, and demonstrated how he approached the car and then struck the driver on the back of the head.  He also showed Jadlos how he threw the gun towards the Passaic River after running from the scene.  Although they looked for the gun, they were unable to find it.

During the course of their investigation, the police interviewed a number of individuals who confirmed defendant's involvement in the shooting. Dana Anderson informed police that shortly before 11 p.m. on the night of the shooting, he was in his basement apartment along with his girlfriend, Jocelyn Johnson; his cousin, Dontai Edmond; defendant, Greene, and Tracy Tisdol.  Although Anderson denied any knowledge of the shooting in his statement to the police at that time, at trial he stated that he had overheard defendant discussing plans to commit a robbery with Greene and Tisdol just before the three left his house around 10:30 or 11 p.m.  According to Anderson, defendant had a small chrome gun with a black handle in his possession at the time.

Anderson also stated at trial that, about one hour or so later, defendant called from Greene's house and informed Anderson that he, Tisdol and Greene had attempted to rob "somebody" and that the gun had gone off and that he was not sure whether the "lady" had been hit.  According to Anderson, defendant insisted on coming back to his house, and Tisdol and Greene arrived shortly thereafter.  At that time, defendant repeated what he had said on the phone in front of both Johnson and Edmond.

Jocelyn Johnson confirmed that Anderson received two phone calls at about 12:30 or 1 a.m. on July 14, 1995.  She recalled that, shortly thereafter, defendant showed up, followed almost immediately by Greene and Tisdol, and informed them that he, Tisdol and Greene had tried to rob two girls in a car and that he thought he had shot one of them.  Johnson stated that defendant explained that he "cocked the gun" to make sure the girls knew that he meant business, and that as he went to strike one of the girls with the gun, it suddenly went off.  According to Johnson, defendant stated that he looked in the car and asked the girl if she was okay but got no response and immediately ran from the scene.

6

Camara Johnson, Jocelyn Johnson's best friend, informed police that she visited Anderson at 9 or 10 p.m. on July 14, 1995.  She recalled that Jocelyn, defendant and Greene were also present at the time. According to Camara, while she was there, defendant whispered in her ear that he thought he had shot and killed a girl.

The police also learned that Beverly Cameron, one of defendant's former next-door neighbors in Paterson, had seen defendant with a gun two weeks before the shooting.  She explained that defendant had briefly pulled the gun out of his pocket in the street in front of her house, and she had been able to see that it was small, black and shiny.  At trial, Cameron confirmed that the gun she had seen and the murder weapon were one and the same.

Jadlos later located the gun based upon information provided by Edmond.  No usable fingerprints were found on the weapon.  ...

Sergeant Joseph Kucich, a ballistics expert with the New Jersey State Police, examined the .25 caliber semi-automatic Lorcin pistol, as well as the discharged shell and bullet.  He confirmed that the pistol was operable and that it had discharged the bullet and shell.  Kucich explained that a bullet had to be loaded into the firing chamber by pulling back the top of the gun before the weapon could be fired.  He further noted that the pistol did not fall in the "hair trigger" category because it took five pounds of pressure, rather than the requisite six ounces, to make the gun discharge.

On August 8, 1996 Nativo came across cards containing defendant's fingerprints, which had been taken on August 24, 1995, and saw that there might be a match with one of the latent prints lifted from the driver's side roof of Vargas's car.  He arranged to have the latent print and the cards sent to the FBI, where they were reviewed by John Massey, a fingerprint specialist.  Massey confirmed that one of the defendant's prints matched the latent lift.

Based upon this evidence, the jury found defendant guilty of all the crimes as charged in the indictment. In so doing, the jury declined to find defendant guilty

of the lesser-included offenses of aggravated
manslaughter, manslaughter and robbery.

(Answer, Ex. 11.)

B.    Procedural History

        On July 15, 1995 Detective James Lawrie swore out
a juvenile complaint charging defendant Corie Miller,
then age 17, with acts of delinquency which, if
committed by an adult, would constitute murder, felony
murder, armed robbery, possession of a firearm for an
unlawful purpose, unlawful possession of a weapon.  On
July 21, 1995 Investiator James Wood swore out a second
juvenile complaint charging defendant with additional
acts of delinquency which, if committed by an adult,
would constitute armed robbery, carjacking, conspiracy
and aggravated assault.

        In July 1995, a probable cause hearing was held
before Judge Clark who found that probable cause
existed to charge defendant with these crimes.  On
October 13, 1995 Judge Ferrante of the Chancery
Division, Family Part, heard and granted the State's
request to waive jurisdiction of the matter so that
defendant could be charged as an adult in the Superior
Court, Law Division.

        On November 28, 1995 a Passaic County Grant Jury
returned Indictment No. 95-11-1254I, charging defendant
with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and
(2) (count one); felony murder, N.J.S.A. 2C:11-3(a)(3)
(count two); conspiracy to commit armed robbery,
N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1 (count three);
armed robbery, N.J.S.A. 2C:15-1 (counts four and five);
possession of a weapon for an unlawful purpose,
N.J.S.A. 2C:39-4(a) (count six); aggravated assault,
N.J.S.A. 2C:12-1(b)(2) (count seven); receiving stolen
property, N.J.S.A. 2C:20-7 and N.J.S.A. 2C:20-
2(b)(2)(b) (count eight); and unlawful possession of a
weapon, N.J.S.A. 2C:39-5 (count nine).  Codefendants
Tracy Tisdol and Meshach Greene were also charged under
this indictment but tried separately.

        Defendant was tried before Judge Subryan and a
jury from September 11 to 18, 1996.  At the close of
the State's case, defendant moved for a judgment of

> acquittal; this motion was denied.  On September 20,
> 1996 the jury found defendant guilty as charged.
>
> On November 8, 1996 defendant appeared before
> Judge Subryan for sentencing.  ...
>
> The aggregate sentence imposed was life plus
> twenty-five years, with a forty-two and one-half year
> parole disqualifier, and an aggregate V.C.C.B. penalty
> of $850 and an aggregate Safe Neighbnorhood Services
> assessment of $450.

(Answer, Ex. 11.)

On direct appeal, the Superior Court of New Jersey,

Appellate Division, affirmed Petitioner's conviction and

sentence.  (Answer, Ex. 11.)  By Order filed March 22, 2000, the

Supreme Court of New Jersey denied certification.  (Answer, Ex.

8.)

On or about March 1, 2001, Petitioner filed a petition for

post-conviction relief.  On April 10, 2001, following a hearing,

the trial court denied relief.  (Answer, Exs. 7, 30.)  By Opinion

filed June 19, 2005, the Appellate Division affirmed the denial

of relief.  (Answer, Ex. 2.)  On October 3, 2002, the Supreme

Court of New Jersey denied certification.  (Answer, Ex. 1a.)  On

April 8, 2003, the Supreme Court of the United States denied

certiorari.  (Answer, Ex. 1.)  This Petition followed.

Petitioner asserts (1) that he was denied his Sixth

Amendment right to confront witnesses and was deprived of due

process by the admission of hearsay testimony, (2) that he was

deprived of due process by improper jury instructions, and (3)

that he was denied the effective assistance of trial and appellate counsel.  This matter is ready for disposition.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> With respect to any claim adjudicated on the merits in state

court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determinated by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent."

Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).  A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter).  Id. at 407-09.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  See

Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000),
cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL
1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell,
290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and
cases discussed therein).

     The deference required by § 2254(d) applies without regard
to whether the state court cites to Supreme Court or other
federal caselaw, "as long as the reasoning of the state court
does not contradict relevant Supreme Court precedent." Priester
v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v.
Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19
(2002)).

     Although a petition for writ of habeas corpus may not be
granted if the Petitioner has failed to exhaust his remedies in
state court, a petition may be denied on the merits
notwithstanding the petitioner's failure to exhaust his state
court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v.
Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v.
Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

     Finally, a pro se pleading is held to less stringent
standards than more formal pleadings drafted by lawyers.  Estelle
v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S.
519, 520 (1972).  A pro se habeas petition and any supporting
submissions must be construed liberally and with a measure of

tolerance.   See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998);
Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989);
United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969),
cert. denied, 399 U.S. 912 (1970).]

III.   ANALYSIS

A.   Hearsay Testimony

At trial, in response to a cross-examination question about
what Petitioner allegedly had told him, Sergeant Finer stated in
front of the jury that Petitioner's statement "was consistent
with what I was learning from [codefendant] Mr. Greene at that
time."[2]  The trial court denied Petitioner's motion for a
mistrial and then, over the objection of defense counsel, who
preferred not to highlight the objectionable statement to the
jury, instructed the jury to disregard the hearsay, as follows.

> Ladies and Gentlemen of the Jury:  During the
> testimony of the last witness reference may have been
> made to statements made by someone other than this
> defendant who is not on trial before you.
>
> I instruct you that you are to disregard that
> portion of the testimony as far as it relates to that
> statement.  It is not relevant to this case.  It is not
> material.  You are to disregard it and you are not to
> consider it for any reason whatsoever during your
> deliberations.  It has been stricken from the record of
> this trial.

(Answer, Ex. 11.)  Petitioner contends that the admission of this
hearsay testimony violated his Sixth Amendment right to confront

---

[2] Mr. Greene was tried separately from Petitioner.

13

witnesses against him and his Fourteenth Amendment right to a fair trial.

On direct appeal, the Appellate Division rejected this claim.

> The right "to be confronted with the witnesses against [him]" is guaranteed to criminal defendants by both the federal and New Jersey constitutions. State v. Budis, 125 N.J. 519, 530 (1991) (citing U.S. Const. amend VI; N.J. Const. art. 1, ¶ 10). This right of confrontation affords a defendant the opportunity to question the State's witnesses, protects against improper restrictions on the questions asked during cross-examination, and affords the accused the right to elicit favorable testimony on cross-examination. 125 N.J. at 530-31.

> Thus, "[t]he right to confront and cross-examine accusing witnesses is 'among the minimum essentials of a fair trial.'" Id. at 531 (quoting Chambers v. Mississippi, 410 U.S. 284, 294-95, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297, 308 (1973)). As such, the denial or significant limitation of the right of confrontation "'calls into question the ultimate integrity of the factfinding process and requires that the competing interests be closely examined.'" 125 N.J. at 532 (quoting Chambers, 410 U.S. at 295, 93 S.Ct. at 1046, 35 L.Ed.2d at 309). Because the admission of a non-testifying defendant's confession in a joint trial has the potentiality for prejudice to other defendants implicated by that confession, a trial court should, if possible, grant an implicated defendant's request to delete all incriminating references contained within the statement so as to avoid a confrontation clause violation. State v. Bruton, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476, 479 (1968); State v. Young, 46 N.J. 152, 156-57 (1965).

> Defendant urges that the trial judge committed fatal, reversible error in denying his motion for a mistrial following the improper admission of Finer's comment regarding the content of non-testifying codefendant Greene's highly prejudicial and unreliable statement to the police. According to defendant, Finer's improper comment was "devastatingly

14

prejudicial" to him because it undermined his basic
defense that it was Greene who shot Villalba and also
"rehabilitate[d] the holes left in the [S]tate's case."
In defendant's view, the prejudicial effect of Finer's
comment was only increased by the trial judge's
subsequent limiting instruction which "likely
highlighted the content of the hearsay."  We cannot
agree that the trial judge abused his discretion in
denying defendant's motion for a mistrial.

    ...

    The trial judge provided the jury with a carefully
worded limiting instruction directing them to disregard
Finer's comment which, we must assume, the jury
faithfully followed.  State v. Manley, 54 N.J. 259, 270
(1969).  Further, contrary to defendant's
representations, the evidence presented in this case
against defendant was far from weak, making it highly
unlikely that Finer's casual conclusory remark was
"devastatingly prejudicial."  Not only did defendant
admit to shooting Villalba, but his fingerprint was
found on the driver's side of Vargas's car.  Also,
while Vargas's in-court identification of defendant as
the shooter differed from her initial casting of Greene
in that role, Vargas was adamant throughout that the
shooter was the heaviest of the three men, a
description which fit defendant, not Greene.  Finally,
defendant's identity as the shooter was also confirmed
by Anderson, Jocelyn Johnson and Camara Johnson.
Finer's off-hand comment amounted to harmless error
which did not require the extreme remedy of a mistrial.

(Answer, Ex. 11.)

    The Sixth Amendment's Confrontation Clause provides that,

"In all criminal prosecutions, the accused shall enjoy the right

... to be confronted with the witnesses against him."  This

guarantee applies to both federal and state prosecutions.

Pointer v. Texas, 380 U.S. 400 (1965).

    After Petitioner's conviction, the Supreme Court decided

Crawford v. Washington, 541 U.S. 36 (2004), partially overruling

<u>Ohio v. Roberts</u>, 448 U.S. 56 (1980) (permitting admission of hearsay statements bearing "adequate indicia of reliability" if they either fell within a "firmly rooted hearsay exception" or possessed other "particularized guarantees of trustworthiness"), and limiting the admissibility of hearsay testimony in criminal trials.

Accordingly, we once again reject the view that the Confrontation Clause applies of its own force only to in-court testimony, and that its application to out-of-court statements introduced at trial depends upon "the law of Evidence for the time being." Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices. ...

This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns. ...

The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused -- in other words, those who "bear testimony." "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," ... "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,"

16

"statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it.  Regardless of the precise articulation, some statements qualify under any definition -- for example, ex parte testimony at a preliminary hearing.

Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.

...

The historical record also supports a second proposition:  that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.

<u>Crawford</u>, 541 U.S. at 50-54 (citations omitted).  Thus,

Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law -- as does <u>Roberts</u>, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.  Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required; unavailability and a prior opportunity for cross-examination.  We leave for another day any effort to spell out a comprehensive definition of "testimonial."  Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.  These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

<u>Crawford</u>, 541 U.S. at 68 (footnote omitted).

Here, the testimony at issue involved a statement made during a police interrogation, clearly "testimonial" hearsay.

17

Thus, the Sixth Amendment prohibits the admission of such hearsay testimony absent unavailability and a prior opportunity for cross-examination.

A violation of the Confrontation Clause, however, is subject to harmless error review.  See, e.g., Crawford, 541 U.S. at 76 (Rehnquist, C.J., concurring in the judgment) ("to the Court's credit is its implicit recognition that the mistaken application of its new rule by courts which guess wrong as to the scope of the rule is subject to harmless-error analysis"); United States v. Hinton, 423 F.3d 355, 362-63 (3d Cir. 2005).  Here, the evidence against Petitioner was substantial and consisted of both physical evidence, eyewitness identification, and Petitioner's own statements to police and other witnesses.  The jury was instructed to disregard the officer's comment.  The error was clearly harmless.

Nor was there any violation of Petitioner's due process rights, where the improper testimony consisted of one sentence, defense counsel immediately objected, and the Court promptly provided curative instructions.  Cf. Greer v. Miller, 483 U.S. 756, 766 (1987) (where prosecutor improperly called attention to defendant's post-arrest silence, "[t]he sequence of events in this case--a single question, an immediate objection, and two curative instructions [omitted footnote]--clearly indicates that

the prosecutor's improper question did not violate [Defendant's] due process rights."

The state court's determination of this claim was not contrary to nor an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief on this claim.

B.   Ineffective Assistance of Counsel

1.   Trial Counsel

Petitioner claims that he was deprived of the effective assistance of trial counsel because his counsel did not advise him that he had a right to testify at his Miranda[3] hearing, at which it was determined that his statement "I didn't mean to shoot that girl," was admissible.

Before the state PCR court, Petitioner asserted that he would have testified that the confession was coerced by threat of force based upon the interrogators' threatened use of a billy club.  (Answer, Ex. 30.)  Reviewing the Miranda hearing at length, the PCR court noted that there was ample evidence presented at the Miranda hearing to find Petitioner's waiver of his Miranda rights to be knowing and voluntary and to find his statement voluntary.  Petitioner was nearly 18 years old at the time and had previous involvement with the juvenile justice system.  He was read his Miranda rights and waived them.  The

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

court found Petitioner's allegation of threat of force, not made until the second set of papers submitted in connection with the petition for post-conviction relief, not to be credible. Moreover, the court found substantial danger would have derived from Petitioner's testifying at the <u>Miranda</u> hearing, where he would have been subject to cross-examination.  Finally, the court noted that the statement that was admitted did not damage Petitioner at trial, but supported his claim that the gun discharged accidentally.  The court identified the governing law as <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), found that counsel had not failed to provide effective assistance under the <u>Strickland</u> standard, and denied relief.  The Appellate Division affirmed without discussion.  (Answer, Exs. 2, 30.)

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI. The right to counsel is "the right to <u>effective</u> assistance of counsel."  <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been

different.  Strickland v. Washington, 466 U.S. 668, 687, 694 (1984).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  Strickland at 694. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.

The performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed."  Id. at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Id. at 690-91.  If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of

<u>Strickland</u>.   <u>See</u> <u>Berryman v. Morton</u>, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

With respect to the underlying issue here, counsel's alleged failure to advise Petitioner of his right to testify at the <u>Miranda</u> hearing and Petitioner's contention that, had he testified, he would have testified to the threat of force in obtaining his confession, the issue presented is whether counsel failed to provide effective assistance in preserving Petitioner's right to remain silent under the Fifth Amendment.

Pursuant to the Fifth Amendment to the United States Constitution, "No person ... shall be compelled in any criminal case to be a witness against himself ... ."  In <u>Miranda v. Arizona</u>, the Supreme Court of the United States held that:

> when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the

> prosecution at trial, no evidence obtained as a result
> of interrogation can be used against him.

384 U.S. at 478-79 (footnote omitted).

A waiver may be made orally or may be implied from a suspect's conduct.  See North Carolina v. Butler, 441 U.S. 369, 373 (1979); United States v. Cruz , 910 F.2d 1072, 1080 (3d Cir. 1990), cert. denied, 498 U.S. 1039 (1991).  To introduce into evidence a suspect's statement made during custodial interrogation, the government must establish, by a preponderance of the evidence, a voluntary waiver of Miranda rights.  Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).  This is a rule of constitutional dimension, violation of which may justify issuance of a writ of habeas corpus.  See generally Dickerson v. United States, 530 U.S. 428 (2000).

> Once warnings have been given, the subsequent
> procedure is clear.  If the individual indicates in any
> manner, at any time prior to or during questioning,
> that he wishes to remain silent, the interrogation must
> cease.  At this point he has shown that he intends to
> exercise his Fifth Amendment privilege; any statement
> taken after the person invokes his privilege cannot be
> other than the product of compulsion, subtle or
> otherwise.  Without the right to cut off questioning,
> the setting of in-custody interrogation operates on the
> individual to overcome free choice in producing a statement after the

Miranda, 384 U.S. at 473-74.  A defendant's right to cut off questioning must be "scrupulously honored."  Michigan v. Mosley, 423 U.S. 96, 103-04 (1975).

"The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.  But ...

'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'" Dickerson, 530 U.S. at 444.

"[T]he ultimate issue of 'voluntariness' is a legal question requiring independent federal determination," and is thus not subject to the § 2254(d) presumption of correctness. Miller v. Fenton, 474 U.S. 104, 109-110 (1985).

> The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." Arizona v. Fulminante, 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In determining whether a statement is voluntary, Supreme Court precedent requires consideration of "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." Dickerson v. United States , 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). These surrounding circumstances include "not only the crucial element of police coercion, Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)," but may also include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." Withrow v. Williams, 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (some internal citations omitted).

Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002). "[S]ubsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda warnings, often require the resolution of conflicting testimony of police and defendant.

The law is therefore clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable." Dickerson, 474 U.S. at 117.

"This totality of the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." Fare v. Michael C., 442 U.S.707, 725 (1979).

Here, the PCR court gave no credence to Petitioner's belated claim of coercion.  The court stood by its findings at the Miranda hearing that Petitioner understood his Miranda warnings and gave his statement voluntarily.  In addition, the PCR court found no ineffective assistance of counsel because the statement that was admitted supported Petitioner's theory of defense that the shooting was accidental.  Thus, Petitioner suffered no prejudice.  Petitioner is not entitled to relief on this claim.

2. Appellate Counsel

Petitioner contends that he was deprived of effective assistance of appellate counsel because appellate counsel did not argue that his confession should have been suppressed based upon the failure of police to follow appropriate procedures in obtaining a confession from a minor.

The Appellate Division rejected this claim.

We add only the following comments with regard to defendant's claim that he was denied effective

25

assistance of appellate counsel for counsel's failure
to argue that defendant's statement to the police
should have been suppressed because defendant's mother
was not present when he was questioned by the police.

The murder occurred late in the evening on July
13, 1995.  Cindy Villalba went for a ride with her
friend, Julias Vargas, in Vargas' car at approximately
11:00 p.m. that evening.  As they stopped the car on
the side of the road, three men approached the car.
One man approached Villalba's side; the other two,
including defendant, approached Vargas' side.
Defendant stuck the gun through the open window, held
it next to Vargas head, and demanded money.  He pulled
the "slide" on the gun back.  As defendant struck
Vargas on the back of her head with the gun, he shot
Villalba.  Vargas then saw blood on Villalba who was
gasping for air.  She drove Villalba to a hospital,
where Villalba died from a gunshot wound.

There was testimony that defendant had called an
acquaintance, Dana Anderson, whom he told that he and
others went "to rob somebody and while they was
robbing, the gun went off."  About two weeks before the
shooting, defendant was observed by his former next
door neighbor pulling a gun out of his pocket.  The gun
matched the description of the gun used in the robbery.
The neighbor claimed defendant told her he had been
robbed recently and needed the gun for protection.

On July 15, defendant was taken to the police
station along with a co-defendant, Mesach Greene.
Defendant was not a suspect at that time.  He was
escorted to the police station because he was sleeping
in Greene's apartment when Greene was arrested.  Both
Greene and defendant denied any involvement in the
robbery.  Defendant was seventeen years old.

After he was interviewed by the police, Detective
Jadlos contacted defendant's mother, Charlene Barnaby,
and asked her whether she wanted to pick defendant up
because he was going to be released.  Jadlos testified
that he "told her that we had her son down here at
Paterson Police Headquarters and we were conducting an
investigation, and we thought that we were going to
release him and that if she would come down to take
custody of him since he was a minor."  He testified
that Barnaby responded "that Corie had left home

26

without her permission earlier that week and she didn't want to have -- she had enough problems with him and she didn't want to have anything to do with him, and he was old enough to leave and he could find his way back home."

Although defendant was released, Greene was not. The police continued to question him.  Greene confessed and implicated defendant as the shooter.

Defendant was brought back to the police station. He was read his <u>Miranda</u> warnings and signed the <u>Miranda</u> rights form.  Detective McNamara placed a telephone call to defendant's mother.  He left a message on the answering machine.  He also left a message on defendant's mother's beeper.  When defendant's mother called back, Detective McNamara told her that her son may be involved in a shooting.  His telephone conversation with her was tape recorded and marked into evidence at the <u>Miranda</u> hearing.  Barnaby was asked for and gave the police permission to speak with defendant. The detective did not tell her that her son was under arrest, but did say that the police wanted to talk to her son about a shooting.  Defendant, after being told that his mother gave the police permission to speak with him, confessed to the shooting; he began to cry and stated:  "I did not mean to shoot that young girl. It was an accident."

Defendant's mother later arrived at the detective bureau.  Defendant's formal statement had not yet been taken.  After speaking with her son she said she did not want her son to give a written statement; no written statement was taken.  Barnaby did attend the <u>Miranda</u> hearing, but was not called to testify.

To establish a prima facie case of ineffective assistance of counsel, a defendant must show that: (1) counsel's performance was deficient; and (2) a reasonable probability exists that but for counsel's deficiency, the result of the proceeding would have been different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 ... (1984).  With respect to the first prong of the test, great deference is given in evaluating counsel's performance.  <u>Id.</u>, 466 U.S. at 689-90 ... (stating that "a strong presumption [exists] that counsel's conduct falls within the wide range of reasonable professional assistance").  The second prong

27

of the <u>Strickland</u> test requires that prejudice be proven, not presumed. ... To establish a reasonable probability that counsel was ineffective, a defendant must show that counsel's error was "sufficient to undermine confidence in the outcome." ... If a defendant presents a prima facie claim, a trial court should grant an evidentiary hearing to resole ineffective assistance of counsel claims. <u>State v. Precise</u>, 129 N.J. 451, 462 (1992). To be entitled to the hearing, a defendant must demonstrate a reasonable likelihood of succeeding under the <u>Strickland</u> standard. <u>Id.</u> at 463.

In this case, the <u>Strickland</u> test has not been met. The police must make a good faith effort to locate a parent or legal guardian before beginning interrogation of a juvenile. <u>State in re J.F.</u>, 286 N.J. Super. 89, 98 (App.Div. 1995) (citations omitted). Here, police did make reasonable efforts to have the juvenile's mother present when the juvenile was questioned. She chose not to attend until after defendant confessed to the crimes. Once she did attend and requested that defendant not give a written statement, her request was honored and no written statement was taken. The actions of the police were reasonable under the circumstances. That counsel did not raise this issue on appeal does not render counsel's assistance ineffective.

The evidence against the juvenile was overwhelming. At the post-conviction relief hearing, the judge, who was also the trial judge, stated,

> the petitioner's fingerprints were found on the victim's car. There were two lay witnesses who testified that when he left the home, he had that gun with him. There were witnesses who testified that when he left the home in Paterson they said that they were going to commit a robbery ... . His allegation that the gun went off accidentally was addressed by an expert from the State who testified before the jury that the way he described it the gun could not have gone off accidentally.

In the context of this evidence, there is no reasonable likelihood that defendant would succeed under the <u>Strickland</u> standard. There is no basis for error.

28

(Answer, Ex. 2.)

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985).  The Strickland standard for effective assistance of counsel applies to appellate counsel. See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Here, the state courts found meritless the claim that Petitioner alleges should have been raised on appeal.  Petitioner was an older juvenile who was familiar with the criminal justice system.  He was able to make a voluntary statement.  Moreover, Plaintiff has failed to establish any impropriety in the police efforts to locate Petitioner's mother and obtain her permission to question him.[4]  Finally, the statement obtained from

---

[4] In this regard, the Court notes that Petitioner obtained, during the course of this action, a transcript of the police conversation with his mother but has not submitted any further argument based on that transcript.

Petitioner, that he killed Ms. Villalba by accident, supported his theory of the case. Thus, Petitioner suffered no prejudice from counsel's failure to raise the claim. Petitioner is not entitled to relief on the claim of ineffective assistance of appellate counsel.

C.   Jury Instructions

Petitioner contends that the trial court denied him a fair trial (1) by failing to tailor the charge to the facts, (2) by omitting any reference in the charge that, if Petitioner never intended to fire the gun, the jury should consider that Petitioner may not be guilty of purposeful or knowing murder, and (3) by failing to charge the jury on "causation."

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief. Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing
> instruction by itself so infected the entire trial that
> the resulting conviction violates due process." It is
> well established that the instruction "may not be
> judged in artificial isolation," but must be considered
> in the context of the instructions as a whole and the
> trial record. In addition, in reviewing an ambiguous
> instruction ..., we inquire "whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way" that violates the
> Constitution. And we also bear in mind our previous
> admonition that we "have defined the category of
> infractions that violate 'fundamental fairness' very
> narrowly." "Beyond the specific guarantees enumerated
> in the Bill of Rights, the Due Process Clause has
> limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations
omitted).  Thus, the Due Process Clause is violated only where
"the erroneous instructions have operated to lift the burden of
proof on an essential element of an offense as defined by state
law."  Smith v. Horn, 120 F.3d 400, 416 (1997).  See also In re
Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause
protects the accused against conviction except upon proof beyond
a reasonable doubt of every fact necessary to constitute the
crime with which he is charged"); Sandstrom v. Montana, 442 U.S.
510, 523 (1979) (jury instructions that suggest a jury may
convict without proving each element of a crime beyond a
reasonable doubt violate the constitutional rights of the
accused).

    Where such a constitutional error has occurred, it is
subject to "harmless error" analysis.  Smith v. Horn, 120 F.3d at
416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999).  "[I]f
the [federal habeas] court concludes from the record that the
error had a 'substantial and injurious effect or influence' on
the verdict, or if it is in 'grave doubt' whether that is so, the
error cannot be deemed harmless."  Id. at 418 (citing California
v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a challenged
instruction,

        a single instruction to a jury may not be judged in
        artificial isolation, but must be viewed in the context
        of the overall charge.  If the charge as a whole is

ambiguous, the question is whether there is a
reasonable likelihood that the jury has applied the
challenged instruction in a way that violates the
Constitution.

Middleton v. McNeil, 124 S.Ct. 1830, 1832 (2004) (internal
quotations and citations omitted).

Here, the Appellate Division addressed each of Petitioner's
challenges to the jury instructions and found that the challenged
instructions were proper and in conformity with governing state
law. (Answer, Ex. 11 at 24-36.)  This Court is bound by the
Appellate Division's conclusion that there was no error of state
law in the challenged instructions.  As the instructions
conformed to state law, they did not operate to deprive
Petitioner of a fair trial.  Petitioner is not entitled to relief
on this claim.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or
judge issues a certificate of appealability, an appeal may not be
taken from a final order in a proceeding under 28 U.S.C. § 2254.
A certificate of appealability may issue "only if the applicant
has made a substantial showing of the denial of a constitutional
right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this
standard by demonstrating that jurists of reason could disagree
with the district court's resolution of his constitutional claims
or that jurists could conclude the issues presented are adequate

to deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability will issue.

V.   <u>CONCLUSION</u>

For the reasons set forth above, the Petition must be denied.  An appropriate order follows.

s/William J. Martini

_____
William J. Martini
United States District Judge

Dated: 12/2/05